NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13770

COMMONWEALTH  vs.  RAYMOND J. WHITE.


Suffolk.     December 8, 2025. - May 1, 2026.

Present:  Budd, C.J., Gaziano, Wendlandt, Dewar,
& Wolohojian, JJ.


Homicide.  Robbery.  Practice, Criminal, Instructions to jury, Presumptions and burden of proof, Hearsay, Argument by prosecutor, Agreement between prosecutor and witness, New trial, Capital case.  Due Process of Law, Identification, Prisoner's dock.  Evidence, Identification, Presumptions and burden of proof, Hearsay, Argument by prosecutor, Joint enterprise.  Felony-Murder Rule.  Identification.  Joint Enterprise.


Indictments found and returned in the Superior Court Department on August 18, 1971.

The cases were tried before James C. Roy, J., and a motion for a new trial, filed on July 6, 2023, was considered by Joshua I. Wall, J.


Cathryn A. Neaves for the defendant.
Erin Knight, Assistant District Attorney, for the Commonwealth.


WOLOHOJIAN, J.  In 1972, after a jury trial, the defendant and his codefendant, James Hall, were each convicted of two

counts of murder in the first degree, G. L. c. 265, § 1, and one count of armed robbery, G. L. c. 265, § 17, as appearing in St. 1952, c. 406, § 1. We affirmed Hall's convictions in 1976. See Commonwealth v. Hall, 369 Mass. 715 (1976). But in the fifty-four years since his trial, the defendant's convictions have never been subject to appellate review. This is partly because counsel failed to perfect the defendant's appeal from 1972 to 1980, partly because the defendant escaped from custody from 1980 to 1988, and partly because of the defendant's own inaction thereafter.

In 2018, we allowed the defendant to pursue a motion for a new trial and said that we would treat any appeal from the denial of that motion as the functional equivalent of a direct appeal, including by affording plenary review under G. L. c. 278, § 33E. White v. Commonwealth, 479 Mass. 1023, 1026-1027 (2018). That appeal is now before us. Applying the law as it existed in 1980 to the defendant's claims of trial error, and after conducting plenary review of the entire case, we affirm the denial of the defendant's motion for a new trial.

Background. We summarize the facts the jury could reasonably have found, reserving some facts for later

discussion.[1]

On Saturday, August 14, 1971, an employee of Freedom Foods supermarket on Columbia Road in the Dorchester section of Boston asked a bank to send additional cash so the store could cash checks for its customers that day. Such cash deliveries took place on a recurring schedule on certain days of the week and month. On this occasion, the requested cash ($29,325) was transported from the bank by Calvin Thorn, who was employed by a private security company. Thorn arrived at the supermarket at around 10:30 A.M. with the cash stored in bank bags in the trunk of his car. He went into the store and brought Harry Jeffreys, another employee of the same security company who was stationed inside the store, outside as additional protection. Jeffreys was armed. As Thorn unlocked the trunk of the car to remove the bags of cash, two men ran out of the supermarket and shot Thorn and Jeffreys multiple times from about three feet away. Jeffreys managed to return a single shot, hitting one of the robbers in the groin. Thorn and Jeffreys both died from their wounds. See Hall, 369 Mass. at 718.

There were several eyewitnesses to the crimes. One, the

---

[1] While we draw some language from this court's recitation of the same events in Hall, 369 Mass. at 718-721, our summary of the facts here reflects our independent review of the record.

supermarket's "bundle boy,"[2] saw the two robbers take several bags of money from the trunk of Thorn's car and then run toward Columbia Road. The taller of the two wore sunglasses and a white cap and clutched his groin as he ran. The bundle boy followed the two men and saw them get into a parked car and then drive away in the direction of Franklin Park. The car was missing a chrome strip on its right side, and the bundle boy memorized the car's registration number, which was conveyed to the police.

The supermarket manager saw the robbers running away and recognized one of them as the defendant, who had recently worked at the store as a security guard and had been employed by the same security company as the two victims.

After speaking to witnesses at the scene, the police went to the defendant's home. They then proceeded to the apartment of the defendant's sister, Nina, on Columbia Road approximately one-half mile from the supermarket, arriving about seventy-five minutes after the shooting. There were fresh, wet spots of what appeared to be blood on the stairs leading to the apartment and on the floor of the hall in front of the door to the apartment. The officers knocked, and Nina came to the door but did not let

---

[2] The "bundle boy" was stationed outside the grocery store and was responsible for putting bundles of groceries into customers' cars.

them in.  About fifteen minutes later, Hall's cousin, L.C. Clayton,[3] came to the door, spoke to the officers, and then went back into the apartment.  About ten or fifteen minutes after that, the defendant came out of the apartment with his hands over his head.  After some discussion with the defendant, the officers entered the apartment.

Inside Nina's apartment, the officers found the following. Hall was lying on a bed naked, bleeding from the area of his groin.  Sunglasses flecked with what appeared to be blood were under the bed, and a white cap was in the closet.  Next to the bed was a bucket containing about one quart of blood, some articles of blood-soaked clothing, two live .38 caliber rounds, and six spent .38 caliber shell casings.  Two .38 caliber handguns, a Colt and an Iver Johnson, were on a pile of laundry in a closet.  Later ballistics testing showed that the bullets that killed Jeffreys had been fired from the Colt and that the

---

[3] Clayton was charged as a codefendant along with Hall and the defendant, but his case was severed from theirs for trial. Clayton testified at the defendant's trial as a witness for the Commonwealth.  He testified that Hall had approached him several days before the murders, expressed his intent to rob the supermarket, and requested Clayton's help with obtaining vehicle registration plates to use during the robbery.  Clayton acknowledged giving Hall the requested plates.  He stated that he went to Nina's apartment at around noon on the day of the robbery to get money for the plates and that he saw the defendant, whom he did not know.  One day after the convictions of the defendant and Hall, the Commonwealth filed a nolle prosequi as to each of the indictments against Clayton.

bullets that killed Thorn had been fired from the Iver Johnson. Police investigation later revealed that the defendant had purchased the Colt about seven weeks before the robbery. Near and under the bed were three bank bags and a paper bag containing cash later determined to be in the amount of $19,325. Additional bundled cash in the amount of $7,000 was inside a vacuum cleaner in a closet. Both the bank bags and the stamps on the money were from the same bank from which the supermarket had ordered cash that morning.

On a street near Nina's apartment, officers found a parked car matching a witness's description. There was human blood on the front seat, the steering wheel, the steering column, and the dashboard all the way over to the right-hand side of the car. The car also contained a box containing nineteen live rounds of .38 caliber ammunition. That box, which had originally contained fifty rounds, had been purchased by the defendant a little over a month before the robbery and bore Hall's fingerprints.

Nina testified at trial under a grant of immunity. She testified that the defendant stayed with her on occasion and that, on the morning of the robbery, the defendant and Hall had left her apartment together between 8 and 8:30 A.M. When they returned at around 10:45 A.M., Hall was carrying an Army duffel bag with something in it and was bleeding heavily from his left

thigh.  At Hall's request, Nina placed the two handguns in the closet.  While Nina, who was a nurse, applied a tourniquet to Hall's leg, Hall said to the defendant, "If you had done what you were supposed to, I never would have been shot."  Hall asked Nina to wash the blood out of the car.  When she returned to the apartment after doing so, Clayton arrived.  The police arrived fifteen minutes later, at around 11:45 A.M., and when they knocked on the door, Hall pulled a package of money from the duffel bag and gave it to her to hide in the vacuum cleaner.

Both Hall and the defendant testified in their own defense but presented no other evidence.  Hall's testimony was, in essence, that he had little, if any, memory of the day of the robbery or of the days thereafter because he was "tripping off LSD."  He admitted that he had been shot but claimed no memory of how that had occurred or of being arrested.  The defendant testified that, after he left Nina's house on the morning of the robbery, he returned to his own home where he remained until about 10:50 A.M., at which point he returned to Nina's apartment where he discovered Hall, whom he did not know well, bleeding. He acknowledged that he owned the Colt .38 caliber handgun found in Nina's apartment but said that he had left it there on an earlier occasion.  He also acknowledged that he had worked at the supermarket for the same security company as Thorn and that he knew the two victims and the supermarket manager.  He denied

having gone to the supermarket on the day of the crimes and stated that he did not take part in the shooting or the robbery.

The theory of the defense was that the Commonwealth had not proved beyond a reasonable doubt that the defendant was one of the two robbers. That defense was built primarily on the fact that Clayton was identified as one of the robbers by an eyewitness from a lineup conducted not long after the crimes. On March 21, 1972, the jury convicted the defendant of two counts of murder in the first degree and one count of armed robbery.[4] He was sentenced to death for each of the murder convictions and to life in prison for the armed robbery conviction.

Two days after the convictions, the defendant's trial counsel filed a claim of appeal. But neither he nor the defendant's first appellate counsel perfected the appeal by filing an assignment of errors.[5] For this reason, on February 19, 1974, the trial judge dismissed the appeal.[6]

---

[4] The jury were instructed on two theories of murder in the first degree: premeditation and felony-murder. The record does not indicate on which theory or theories the jury relied.

[5] Prior to July 1979, a defendant was obligated to file an "assignment of errors" summarizing each claim of error within ten days of receiving notice of the initial summary of the record. G. L. c. 278, § 33D, inserted by St. 1925, c. 279, § 1, and repealed by St. 1979, c. 346, § 1.

[6] In the months following his convictions, the defendant wrote to both the court and his trial counsel, stating, "I wish

Seven months later, on September 30, 1974, the trial judge revoked the order dismissing the appeal and subsequently appointed new appellate counsel (second appellate counsel). Second appellate counsel filed a petition for late entry of appeal, which was allowed, as was the defendant's motion to vacate his death sentences and to sentence him to life in prison instead. See District Attorney for the Suffolk Dist. v. Watson, 381 Mass. 648, 650 (1980) (death penalty violates Massachusetts Declaration of Rights). However, second appellate counsel, like the defendant's earlier counsel, never filed an assignment of errors and did not perfect the defendant's appeal.[7]

On August 1, 1980, the defendant filed a pro se motion for a new trial and for appointment of new appellate counsel. A judge, who had not been the trial judge, appointed a third appellate counsel, who, in November 1980, filed a statement of facts in support of the defendant's motion for a new trial.

---

my rights on my appeal protected to the fullest extent." Although on June 26, 1973, trial counsel successfully moved for a twenty-day extension to file the defendant's assignment of errors, trial counsel took no further action on the defendant's behalf. Nor did the attorney who was appointed as the defendant's first appellate counsel.

[7] On December 3, 1979, the defendant wrote to second appellate counsel requesting that he withdraw "[i]n light of the fact that many years have passed since your appointment to prosecute my appeal . . . and that since that time I have heard little or nothing from you."

Not long thereafter, on December 30, 1980, the defendant escaped from custody while on furlough.  As a result, on February 3, 1981, the same judge dismissed with prejudice the defendant's motion for a new trial, concluding that the defendant abandoned the motion when he escaped.

The defendant was returned to custody on July 6, 1988. Thereafter, sometimes acting pro se and sometimes through his fourth appellate counsel, the defendant made various efforts to obtain review of his case; ultimately, in October 1992, fourth appellate counsel filed a motion in the county court seeking an order directing the Superior Court clerk to transmit the record to this court so that the defendant could pursue a direct appeal.  The Commonwealth opposed the motion, which a single justice denied in 1994 after a hearing.  The defendant did not appeal from the denial of this motion.[8]

Twenty years then elapsed without further activity by the defendant until September 2014, when he filed a pro se motion for leave to file a late notice of appeal and a pro se petition pursuant to G. L. c. 211, § 3, to reinstate his direct appeal. Counsel was appointed to represent the defendant, and ultimately, we allowed the defendant to pursue a motion for a

---

[8] The defendant provided an affidavit in connection with his motion for a new trial, averring that he did not consent to his attorney's decision not to appeal.  This assertion was implicitly discredited by the motion judge.

new trial in the Superior Court.  While doing so we stated that, if the judge deciding the motion (motion judge) determined that the defendant had lost his direct appeal due to ineffective assistance of counsel, rather than by his own choice, then the defendant would be permitted to raise all claims he could have raised in a direct appeal and to have them considered on their substantive merits as though they had been raised in a direct appeal pursuant to G. L. c. 278, § 33E.  Furthermore, we determined that the defendant would have an unfettered right of appeal from an adverse ruling on his motion for a new trial, and that we would afford plenary review of the case just as he would have received on a direct appeal.  See White, 479 Mass. at 1026-1027.  By these means, we intended that the defendant receive the "functional equivalent" of a direct appeal.  Id. at 1027.

The defendant then waited five years before filing a motion for a new trial, followed by a motion to stay further execution of his sentence.  The motion judge, who had not been the trial judge, denied both motions without an evidentiary hearing.  The motion judge concluded that counsel had been ineffective in failing to perfect the defendant's appeal before 1980.  He further concluded that the defendant had failed to show prejudice from any of his assertions of error at trial and that a new trial was not warranted in light of the defendant's failure to cast doubt on the fairness of the trial or the

evidence of guilt. In addition, the judge vacated the defendant's armed robbery conviction on the ground that it was duplicative. See Commonwealth v. Anderson, 425 Mass. 685, 692 (1997) ("When the possibility exists that a jury may have reached a verdict of murder on the basis of a felony-murder theory, a separate conviction and sentence for the underlying felony cannot stand").

Before us now is the defendant's appeal from the denial of his motion for a new trial, which, as we have already noted, we treat as the functional equivalent of a direct appeal. The Commonwealth does not challenge the motion judge's vacatur of the armed robbery conviction, nor does it challenge the motion judge's conclusion that counsel had been ineffective in failing to perfect the defendant's appeal as of 1980 when he escaped from custody. Accordingly, all that is before us are the merits of the defendant's various claims of error, which, as we previously determined, will be reviewed as though raised on direct appeal and with the benefit of review under § 33E.

Discussion. The defendant raises several arguments in this appeal. First, he challenges three aspects of the jury instructions: he claims that the reasonable doubt instruction unconstitutionally lowered the Commonwealth's burden of proof, that the armed robbery instruction "directed" a guilty verdict, and that the eyewitness identification instruction was

erroneous. Second, he contends that seating the defendant in the prisoner's dock impermissibly eroded the presumption of innocence. Third, he argues that improperly suggestive in-court identifications violated his due process rights. Fourth, he contends that the trial judge erred in admitting against him Hall's out-of-court statement made while Nina was tending to Hall's wound. Fifth, the defendant contends that the prosecutor during closing argument engaged in improper vouching, suggested the existence of facts not in evidence, disparaged the defense, and impermissibly exhorted the jury to do their "job" by convicting the defendant. None of these claims of trial error was objected to at trial. In addition, the defendant argues that the motion judge abused his discretion in rejecting the defendant's claim of newly discovered evidence of an agreement between the Commonwealth and Clayton whereby Clayton would receive favorable treatment in exchange for his testimony.

Before addressing the merits of each of these arguments, we first turn to the question of what law applies to the defendant's claims of trial error given the unusual circumstances presented: namely, a one-half century delay in appellate review caused partly by counsels' failure to perfect the defendant's appeal and partly by the defendant's own actions and inaction.

1.  Applicable law.  The defendant has never received
appellate review in the fifty-four years since his convictions.
He contends that this delay was due to ineffective assistance of
counsel rather than his own fault and that he should therefore
receive the benefit of all new law decided since his convictions
in 1972.  But this argument does not give fair consideration to
the motion judge's findings as to the causes of the delay.
Although the motion judge found that the delay was initially --
i.e., until 1980 -- caused by counsels' failure to perfect the
defendant's appeal, the judge made contrary findings with
respect to the period after 1980.

More specifically, the motion judge found that the
defendant's "voluntary and illegal escape [was] the primary
cause of delay after 1980," noting that the defendant's escape
resulted in the denial of his then-pending motion for a new
trial without an appeal.  Or, as the motion judge put it, he
"chose to escape rather than appeal."  The motion judge also
found that the defendant was responsible for the delay after
1988, when he was returned to custody.  The motion judge further
found that the defendant waited four years before seeking to
pursue an appeal after his return to custody, then another
twenty years after the single justice denied his motion to
transmit the record to this court, and then five additional
years after we gave him leave to file a motion for a new trial.

In addition, the motion judge found that, after the defendant's fourth appellate counsel prepared a motion for a new trial in 2015 for the defendant to review, the defendant informed him that he wanted a new lawyer. The defendant has not challenged or shown error in these findings, and our own review of the record gives no reason to disturb them. See Commonwealth v. Yat Fung Ng, 489 Mass. 242, 248-249 (2022), S.C., 491 Mass. 247 (2023) (where motion judge was not trial judge and did not conduct evidentiary hearing, appellate court in as good position as motion judge to assess record).

A defendant has a statutory right to an appeal, G. L. c. 278, § 28, and a constitutional right to the assistance of counsel in that appeal. Commonwealth v. Frank, 425 Mass. 182, 184 (1997). See Douglas v. California, 372 U.S. 353, 356-357 (1963). When a defendant does not receive a timely direct appeal from his convictions because of ineffective assistance of counsel, the remedy is ordinarily to give him the benefit of the law as it would have applied in the absence of counsel's failure. See Frank, 425 Mass. at 185. This remedy avoids the "selective application of new rules" in favor of "the principle of treating similarly situated defendants the same." Commonwealth v. Figueroa, 413 Mass. 193, 202 (1992), S.C., 422 Mass. 72 (1996), quoting Commonwealth v. Bray, 407 Mass. 296, 299 (1990). Thus, a defendant whose appeal is delayed until a

particular year because of counsel's ineffectiveness is treated the same as a defendant whose timely appeal is pending in that same year. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (defendant receives benefit of any new rule of criminal law decided during pendency of his or her direct appeal where new rule is based on Federal Constitution); Commonwealth v. Augustine, 467 Mass. 230, 257 n.41 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015) (same as to new rules based on Massachusetts Declaration of Rights); Commonwealth v. D'Agostino, 421 Mass. 281, 284 (1995) (same). Accordingly, had the lengthy delay in this case been attributable solely to ineffective assistance of counsel, the defendant would be entitled to developments in the law from the time of his conviction until today to the extent that they applied to him. See Commonwealth v. Bonds, 424 Mass. 698, 700 (1997).

But ineffectiveness of counsel does not account for the entire delay in this case. The motion judge found that the defendant's escape from custody in 1980 caused the loss of his appellate rights from then until 1988, and that his own choices and inaction were the primary cause of the delay thereafter. A defendant is not entitled to new developments in the law in "cases in which the loss of appellate rights was due to the deliberate and counseled choice of the defendant," Frank, 425 Mass. at 185 n.2, or where the delay in appellate review is the

defendant's "fault or . . . he intentionally delayed [an appeal] in order to obtain the benefit of any new law," Bonds, 424 Mass. at 701.  Cf. Commonwealth v. Edwards, 444 Mass. 526, 533 (2005), quoting Reynolds v. United States, 98 U.S. 145, 158 (1878) (adopting principle that defendants can forfeit confrontation rights through wrongdoing because "[t]he Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts").

Thus, for example, in a case where the defendant's appeal was delayed by his escape shortly after conviction in Massachusetts, and by his subsequent out-of-State incarceration on Federal charges, we said that we were "reluctant to conclude that where the defendant, by his own fault, fails to take a direct appeal in a timely fashion, he should nevertheless reap the benefit of changes in the law which occur between his trial and his direct appeal." Commonwealth v. Beauchamp, 424 Mass. 682, 685-686 (1997), S.C., 481 Mass. 1030 (2019).  Because the long delay in Beauchamp was caused by the defendant's escape and subsequent out-of-State incarceration for different crimes, he was only entitled to appellate review of his conviction based on the law as it existed at the time of his escape together with any new rules held to apply retroactively where the issue had been preserved or where waiver could be excused.  Id.

Here, the defendant did not receive a direct appeal before 1980 due to his counsels' failures and is therefore entitled to the benefit of any new developments in the law until 1980 as a remedy for the ineffective assistance of his counsel. However, he is not entitled to developments in the law after 1980 because it was he -- not counsel -- who caused the delay from that point on. That said, he receives the benefit of post-1980 retroactive developments of law to the extent they otherwise apply to him. See Beauchamp, 424 Mass. at 686.

2. Jury instructions. a. Reasonable doubt. The defendant argues that two components of the reasonable doubt instruction lowered the Commonwealth's burden of proof to such a degree that the instruction was constitutionally inadequate. First, the defendant points to language defining reasonable doubt as "the sort of a doubt that would make you pause in considering an important and grave affair in your life." Second, he points to the instruction that "[r]easonable doubt in the law means exactly what those two words mean in common everyday usage: [a] doubt based upon a reason." In assessing the constitutional adequacy of a reasonable doubt instruction, we take the instructions (which we have set out in the margin) as a whole.[9] See Commonwealth v. Bjorkman, 364 Mass. 297, 308

_____

[9] "The burden upon the Commonwealth is to establish the guilt of the defendant, as I have told you. It is not the

(1973), quoting <u>Commonwealth</u> v. <u>Pettie</u>, 363 Mass. 836, 843 (1973) ("propriety of jury instructions must be determined from a consideration of the charge in its entirety, not from viewing 'fragmentary instructions out of context'").

Due process requires that the Commonwealth prove a criminal defendant's guilt beyond a reasonable doubt. <u>Commonwealth</u> v. <u>Russell</u>, 470 Mass. 464, 468 (2015). See <u>Commonwealth</u> v. <u>Rodriguez</u>, 370 Mass. 684, 687 (1976), citing <u>In re Winship</u>, 397 U.S. 358, 364 (1970). But "[t]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof"; instead, the touchstone is

burden and the obligation of the Commonwealth to establish the guilt of a defendant beyond all possible doubt or to [a] degree of certainty that you find in mathematics or the sciences where two and two make four.

"The burden of the Commonwealth is sustained when it has established the guilt of a defendant beyond a reasonable doubt. Reasonable doubt in the law means exactly what those two words mean in common everyday usage: A doubt based upon a reason; a doubt which resides in the mind of a reasonable man who is earnestly seeking the truth.

"It is not a fanciful doubt. It is not a foolish doubt. It is not a doubt which resides in the mind of a juror who simply is seeking an excuse to acquit a defendant. It must be a reasonable doubt.

"If there is a reasonable doubt as to the guilt of a defendant, he is entitled to that doubt and he is entitled to be acquitted. But if no such reasonable doubt exists, then it is your sworn duty to return a verdict of guilty. In a word, a reasonable doubt is the sort of a doubt that would make you pause in considering an important and grave affair in your life."

whether the words used "impress[] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused."  Russell, 470 Mass. at 468, quoting Commonwealth v. Pinckney, 419 Mass. 341, 342, 344 (1995).  The question under the Federal Constitution "is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [In re Winship] standard."  Victor v. Nebraska, 511 U.S. 1, 6 (1994).  "In contrast, in evaluating a reasonable doubt instruction under art. 12 [of the Massachusetts Declaration of Rights], we employ a standard that is more favorable to the criminal defendant, looking instead 'for possible misunderstandings by reasonable jurors.'"  Russell, 470 Mass. at 472, quoting Commonwealth v. Rosa, 422 Mass. 18, 27 n.10 (1996).

In 1977, we concluded that giving jurors specific examples from everyday life in defining reasonable doubt "understate[s] and tend[s] to trivialize the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt," and we announced a new rule that "all references to examples taken from the jurors' lives should be avoided."  Commonwealth v. Ferreira, 373 Mass. 116, 129, 130 (1977).[10]  As we have discussed above, given the posture in which

_____

[10] In Ferreira, the examples of "important" decisions given to the jury were "[w]hether to leave school or get a job or to

this appeal is presented, the defendant is entitled to that rule even though his trial occurred before it was announced.  In addition, because it was a new rule that could not have been foreseen by counsel at the time of trial, we do not treat the lack of objection as a waiver.  See Commonwealth v. Rembiszewski, 391 Mass. 123, 127-128 (1984); Commonwealth v. Garcia, 379 Mass. 422, 440-441 (1980).

At the same time, however, our subsequent 1980 decision in Garcia, which was released before the defendant's escape from custody, also applies.  In Garcia, we explained that the error of constitutional significance was the practice of giving specific examples -- not simply the making of reference "generally to important decisions in the jurors' daily lives." Garcia, 379 Mass. at 439-441.  See id. at 440 n.11, and cases cited (cataloging Federal cases approving general references to daily lives of jurors in reasonable doubt instructions); Commonwealth v. Williams, 378 Mass. 217, 232 (1979) (ordinary decision-making experience alone, without giving specific examples, does not "even raise the spectre of error").

---

continue with your education, or to get married or stay single, or to stay married or get divorced, or to buy a house or continue to rent, or to pack up and leave the community where you were born and where your friends are, and go someplace else for what you hoped was a better job."  Ferreira, 373 Mass. at 129.

Here, although the judge at one point defined reasonable doubt as "the sort of a doubt that would make you pause in considering an important and grave affair in your life," the judge did not give any specific examples of such types of affairs.  The instruction, therefore, avoided the risk of understating or trivializing the Commonwealth's burden of proof through the giving of examples of decision-making in ordinary life.  Accordingly, under the law as it stood in 1980, there was no error in this aspect of the charge.  Moreover, the judge's reference to "important" and "grave" affairs helped convey to the jury the seriousness of the Commonwealth's burden.  See Williams, 378 Mass. at 232 (no error where judge referred to making personal decisions of "great significance").

The defendant also challenges the judge's description of reasonable doubt as "a 'doubt based upon a reason.'"  But, as of 1980, we had on more than one occasion upheld effectively identical language.  See Commonwealth v. Coleman, 366 Mass. 705, 712 (1975); Bjorkman, 364 Mass. at 307-309.  See also Commonwealth v. Hughes, 380 Mass. 596, 601 (1980).  Thus, under the law to which the defendant is entitled in this appeal, this aspect of the charge also was not error.

We recognize, as the defendant points out, that the reasonable doubt instruction in this case did not include the moral certainty language of the Webster charge.  See

Commonwealth v. Webster, 5 Cush. 295, 320 (1850).  But this omission is not fatal, and as stated above, we had, at the pertinent point in time, upheld convictions where the jury were instructed on reasonable doubt in terms meaningfully indistinguishable from the instruction here.  See Coleman, 366 Mass. at 712; Bjorkman, 364 Mass. at 307 n.8.

  b.  Armed robbery.  The judge began his instructions on armed robbery with the following introduction:

> "With respect to the charge of armed robbery, I do not think I will be trespassing upon your province nor violating any rights of these defendants if I suggest to you that neither by their evidence nor by arguments of counsel has any real dispute been made that there was, in fact, an armed robbery committed on the day in question in front of that Freedom Foods store."

The judge then stated, "I suppose I must define [armed robbery] for you, because it is for you to decide whether an armed robbery did occur in spite of the position taken by the defendants," and proceeded to instruct the jury correctly on the elements of armed robbery.  The defendant argues that the trial judge's introductory remarks relieved the Commonwealth of its obligation to prove all elements of armed robbery beyond a reasonable doubt.  Because the defendant did not object at trial, we review to determine whether there was error and, if so, whether it resulted in a substantial likelihood of a

miscarriage of justice.[11]  See Commonwealth v. Roberts, 378 Mass. 116, 123 (1979), S.C., 423 Mass. 17 (1996).

The Commonwealth bears the burden of proving beyond a reasonable doubt every element of the crime charged.  See Commonwealth v. Mitchell, 248 Mass. 536, 538 (1924).  While "a judge may state the evidence and discuss possible inferences therefrom[,] [h]e may not . . . directly express an opinion on the credibility of particular witnesses, nor may he instruct the jury that they must draw particular inferences from the evidence" (citations omitted).  Commonwealth v. Sneed, 376 Mass. 867, 870 (1978).  The judge's instruction incorrectly implied that the defendants, by not contesting the existence of the armed robbery, had conceded elements of the armed robbery charge.  This was error.  See Commonwealth v. Shea, 398 Mass. 264, 269 (1986) ("a defendant's theory of his case cannot relieve the Commonwealth of its burden of proving every element of a crime").  Nevertheless, we conclude that the error did not create a substantial likelihood of a miscarriage of justice.

The judge's statement that there was no "real dispute" that an armed robbery had occurred accurately summarized the evidence at trial.  The defendant did not contest the extensive evidence

---

[11] Although the defendant's armed robbery conviction has been vacated, we do not consider this argument to be moot because it is possible that the murder conviction was based on a theory of felony-murder.  See note 4, supra.

that an armed robbery had occurred, instead resting his defense entirely on whether he was one of the perpetrators.  Along the same lines, Hall also did not contest the occurrence of an armed robbery and his counsel stated in closing to the jury that "[he] certainly would be insulting [their] intelligence if [he] tried to argue that there was not a dastardly crime committed." Neither the defendant nor Hall pursued lines of cross-examination designed to cast doubt on the fact that an armed robbery had occurred, nor did they introduce any evidence to that effect.  Against this background, we see no risk that the jury would have understood the judge's introduction to the armed robbery charge as relieving the Commonwealth of its burden of proof.  See Shea, 398 Mass. at 269 ("whether [an issue] was contested at trial is highly relevant to our determination whether the error in the judge's charge prejudiced the defendant").  This is particularly so given the fact that the judge proceeded to instruct the jury on all the elements of armed robbery.

We are similarly unpersuaded by the defendant's argument that he was prejudiced by the judge's thumbnail sketch of the evidence concerning armed robbery, which he asserts overemphasized the evidence against him and suggested that the

jury should find him to have been one of the robbers.[12]  While a judge's summary of the evidence will inevitably create "emphasis by selection and by reference[,] . . . if the jury draw conclusions therefrom it will be primarily the facts of the case, properly marshalled for their review, and not the personal views of the judge, which will be speaking to them." Commonwealth v. Binkiewicz, 342 Mass. 740, 752-753 (1961), quoting Cahalane v. Poust, 333 Mass. 689, 693 (1956).

Here, the judge highlighted evidence both for and against the defendant; there was "no such preponderance of attention to the prosecution's case as might mislead the jury to the

---

[12] The judge instructed the jury:

"The real issue in this case in respect of the armed robbery is whether or not Hall and [the defendant] were the perpetrators of it.

"Were they there on that day with guns in their hands? . . .  In that connection, you must consider all of the evidence.  First of all, take the situation with respect to [the defendant].

"Was there an identification of him by [the supermarket manager] who knew him?  Was he found in an apartment where the money was recovered?  Was the gun that he admittedly owned found in that apartment?  Was one of these men killed by bullets fired from that gun?  You consider that.

"Do you find that there were no fingerprints on that gun? That paraffin tests were taken which did not disclose the presence of any nitrates on his hand?

"You have a right to consider, and you must consider, his statement under oath here that he was not there, that he was some other place on the day in question."

defendant's prejudice."  Commonwealth v. Therrien, 371 Mass. 203, 206-207 (1976).  Furthermore, the judge instructed the jury, "If I refer to some facts and not to others, it is not for the purpose of indicating that I regard those facts as more important than other facts that I do not mention.  What is important and what is unimportant is for you to determine."  See id. at 207 (rejecting similar challenge where judge told jury not to give "any more credence to a particular piece of evidence that I may happen to mention than [to] any other evidence").

Lastly, we "consider that the jury were likely on their own initiative and as matters of common sense to consider the factors mentioned by the judge."  Commonwealth v. Perez, 390 Mass. 308, 321 (1983), S.C., 442 Mass. 1019 (2004).  The judge drew the jury's attention only to significant pieces of evidence that would have naturally been taken into account by the jury as part of their deliberations even had the judge not drawn attention to them.

c.  Eyewitness identification.  The defendant also argues that the judge's failure to instruct the jury about the possibility of mistaken eyewitness identification violated his due process rights under the rule announced in Commonwealth v. Rodriguez, 378 Mass. 296 (1979), S.C., 419 Mass. 1006 (1995), abrogated by Commonwealth v. Gomes, 470 Mass. 352, 376-378 (2015).  In Rodriguez, 378 Mass. at 301-302, we held that it was

error for a judge to instruct the jury only on dishonesty and bias, rather than unintentional error, as factors affecting witness credibility. Unlike in Rodriguez, the judge in this case instructed the jury to consider witnesses' memory, power of observation, and opportunity to observe the subject of their testimony. The instructions were accordingly not at odds with the law as it stood in 1980. See Commonwealth v. Napolitano, 378 Mass. 599, 609-610 (1979), abrogated on other grounds by Commonwealth v. Crayton, 470 Mass. 228, 241-242 (2014).

3. Prisoner's dock. The defendant and Hall were seated in the prisoner's dock throughout trial. Seven years after their trial, we held that a defendant's request to be seated at counsel table could not be denied absent a finding made on the record that placement in the dock was necessary for security. Commonwealth v. Moore, 379 Mass. 106, 111 (1979). The record does not indicate, and the defendant does not argue, that he made such a request or objected to his placement in the dock during trial. His placement therefore did not violate the rule announced in Moore.

The defendant nevertheless argues that his placement in the dock during trial violated his Federal right to due process. The United States Court of Appeals for the First Circuit opined in 1979 that "the Massachusetts prisoner dock must be considered, as a general matter, to be an unconstitutional

practice" because it "may well dilute the presumption of innocence." Walker v. Butterworth, 599 F.2d 1074, 1081 (1st Cir.), cert. denied, 444 U.S. 937 (1979). Subsequently, in 1999, the First Circuit concluded that seating a defendant in the prisoner's dock absent security concerns violated Federal due process and applied that rule to a case that had been tried in 1976. Moore v. Ponte, 186 F.3d 26, 36 (1st Cir.), cert. denied, 528 U.S. 1053 (1999). We adopted the First Circuit's statement of the law in 2004. See Commonwealth v. Wilson, 443 Mass. 122, 135 (2004), citing Moore, 186 F.3d at 36 ("Absent security concerns, confining a defendant to a prisoner's dock violates that defendant's due process rights").

Passing the question whether seating the defendant in the dock absent security concerns violated his Federal due process rights, and assuming that his lack of objection did not result in waiver, we nonetheless conclude that any error was harmless beyond a reasonable doubt. See Estelle v. Williams, 425 U.S. 501, 506 (1976), citing Harrington v. California, 395 U.S. 250, 251-252 (1969) (Federal constitutional error does not require reversal if harmless beyond reasonable doubt). The evidence of the defendant's guilt was extremely strong. He was recognized during commission of the crimes by the supermarket's manager, who was personally familiar with him as someone who had worked in the store. The manager testified unequivocally that he got a

"side glance" at both robbers and "could identify [the defendant] right off."  Shortly after the shooting, the defendant was found by police in his sister's apartment, along with the murder weapons (one of which he owned), bloodstained bags of money stamped by the same bank teller as the stolen cash, and Hall, who was bleeding from a bullet wound consistent with that inflicted on one of the robbers.  The defendant had bought the ammunition used during the crimes.  Given this evidence, "the jury's impression of [the defendant] was more likely the result of his testimony and the government's evidence, rather than speculation about his placement in the dock."  Moore, 186 F.3d at 37.  Contrast Young v. Callahan, 700 F.2d 32, 37 (1st Cir.), cert. denied, 464 U.S. 863 (1983) (jury's struggle to reach verdict indicated that placement in dock was not harmless beyond reasonable doubt).

The defendant separately argues that his placement in the prisoner's dock impaired his due process rights by rendering in-court identifications of him impermissibly suggestive.  At the time of the defendant's trial in 1972, as now, due process protected criminal defendants against identification by "highly and unnecessarily suggestive" means.  Commonwealth v. Marini, 375 Mass. 510, 519 (1978), citing Commonwealth v. Kazonis, 356 Mass. 649, 651-652 (1970).  But while "there is clearly an element of suggestion in the relative isolation of the defendant

at the defence table or in the dock, counsel is present to
ferret out [any] suggestive influences which he perceives in in-
court identification procedures" (quotation and citations
omitted).  Commonwealth v. Jones, 362 Mass. 497, 500 (1972).
Counsel thus "ha[d] the responsibility, by way of cross-
examination, to bring to the attention of the trier of facts any
circumstances which tend to cast doubt upon a witness's
identification testimony."  Id. at 500-501.  See Napolitano, 378
Mass. at 604.

Three eyewitnesses were asked to identify the robbers at
trial.[13]  The only one to positively identify the defendant was
the supermarket manager, who had unequivocally identified the
defendant in the immediate aftermath of the crimes based on his
familiarity with the defendant.  The defendant has given no
reason to suggest that the supermarket manager's in-court
identification was influenced by the defendant's placement in
the dock.  The two other witnesses testified that the defendant
"look[ed] like" one of the robbers but did not positively
identify him at trial.[14]  Defense counsel effectively cross-

_____

[13] Defense counsel did not ask that the defendant be removed
from the dock before any in-court identification occur, and the
judge had no obligation to move the defendant sua sponte.  See
Jones, 362 Mass. at 501.

[14] The record does not indicate, and the defendant does not
suggest, that the witnesses' testimony was based on
unconstitutionally suggestive pretrial identification

examined all three witnesses to highlight the limitations of each one's identification testimony. In addition, defense counsel emphasized in closing the uncertainty of one witness's identification. The jury were thus made aware of reasons to be skeptical of the identification testimony regardless of the defendant's placement in the dock. Under the applicable law, there was no error.

4. Hearsay. The defendant argues that Hall's statement to the defendant, "If you had done what you were supposed to, I never would have been shot," was hearsay and should not have been admitted against him.

We begin by noting that while Hall objected to Nina's testimony at trial, the defendant did not. While in some circumstances the objection of one codefendant suffices to "put the judge on notice" and thus preserves the issue for both defendants, Commonwealth v. DePina, 476 Mass. 614, 624 n.9 (2017), this is not such a case. Hall's statement was clearly admissible against Hall himself. See Commonwealth v. AdonSoto, 475 Mass. 497, 502 (2016) (defendant's own statements admissible as statements of party opponent). See also W.B. Leach & P.J. Liacos, Massachusetts Evidence 193-194 (4th ed. 1967). Hall's

---

procedures. See Commonwealth v. Mobley, 369 Mass. 892, 895-897 (1976) (absent suggestive pretrial procedures, no need to consider constitutionality of witness's identification while defendant was seated in dock).

objection therefore would not have alerted the judge of the need to perform the very different analysis applicable to determine the admissibility of the statement against the defendant.  In the absence of objection at trial, we review only to determine whether any error resulted in a miscarriage of justice. Commonwealth v. Walden, 380 Mass. 724, 731 (1980).

Out-of-court statements by joint venturers are admissible against each other if made "during the pendency of the cooperative effort and in furtherance of its goal." Commonwealth v. Rakes, 478 Mass. 22, 36 (2017), quoting Commonwealth v. Bright, 463 Mass. 421, 426 (2012).  See Commonwealth v. Simpson, 370 Mass. 119, 122 (1976).  The proponent of the evidence must first establish an "adequate probability" of the existence of the joint venture by means other than the statement sought to be admitted.  Commonwealth v. White, 370 Mass. 703, 709 n.7 (1976).  In the absence of an objection, a judge's finding that a joint venture exists may be implied.  See Simpson, 370 Mass. at 122.

The question whether a joint venture continues beyond the completion of the crime for purposes of the hearsay exception was unsettled at the time of the defendant's trial.  See White, 370 Mass. at 709 & n.8.  In Simpson, however, we determined that a joint enterprise did not end when the defendant and his coventurer returned to the coventurer's apartment after

committing a murder because the two men then "devised and undertook to implement a plan to divert attention from themselves." Simpson, 370 Mass. at 122. Such was the case here. There was evidence that the joint venture continued through ongoing efforts at concealment even after Hall's statement to the defendant. For example, Hall directed that the getaway car be cleaned and that some of the stolen money be hidden in a vacuum cleaner -- both of which occurred after Hall's statement.

The question whether the statement was made in furtherance of the joint venture is closer. However, we need not answer it because, in any event, we discern no substantial likelihood of a miscarriage of justice resulting from admission of Hall's statement against the defendant. Although the statement helped tie the defendant to Hall as the second participant in the robbery, it added little to the already strong evidence showing his participation. Similarly, although the statement suggested that the defendant's role and responsibility had been arranged before the robbery, there was already overwhelming evidence that this was a carefully coordinated and planned set of crimes.[15]

---

[15] For these same reasons, no substantial likelihood of a miscarriage of justice resulted from the lack of an instruction that the jury could consider Hall's statement against the defendant only if they found that it was made during and in furtherance of a joint venture. See Commonwealth v. Braley, 449 Mass. 316, 330-331 (2007) (no substantial likelihood of

5.  <u>Closing argument</u>.  The defendant contends that the prosecutor's closing argument went beyond the permissible bounds of advocacy by referring to excluded evidence, improperly disparaging the defense, personally vouching for witnesses, and telling the jury to "do [their] job."  Because the defendant did not object to any aspect of the prosecutor's closing at trial, we review any error "against the background of the entire case to determine if a miscarriage of justice has occurred."  <u>Commonwealth</u> v. <u>Shelley</u>, 374 Mass. 466, 469 (1978), <u>S.C.</u>, 381 Mass. 340 (1980) and 411 Mass. 692 (1992), quoting <u>Commonwealth</u> v. <u>Nordstrom</u>, 364 Mass. 310, 314 (1973).

a.  <u>Reference to excluded evidence</u>.  As part of his summary of the police investigation in the wake of the crimes, the prosecutor told the jury, "As a result of information received by [the police] -- and there was certain testimony that you did not hear in this case that might be hearsay, and you are aware of that by this time -- they go directly to . . . the home of the defendant."  The prosecutor's comment referred directly to a statement received by police that the judge had expressly excluded earlier in the trial.

---

miscarriage of justice from incomplete instructions on joint venture where defendant did not object at trial and challenged statement was admissible under joint venture theory).

It is "highly improper" for a prosecutor to "invite[] the jury to speculate" on excluded evidence. Nordstrom, 364 Mass. at 316. Furthermore, the prosecutor's statement impermissibly suggested that he knew more about the case than he had presented at trial. See Commonwealth v. Dinkins, 415 Mass. 715, 725 (1993). Similar statements have been treated as grounds for a new trial when they "went to the very heart of the case" and "struck impermissibly . . . at the defendant's sole defense." Shelley, 374 Mass. at 471. See Commonwealth v. Burke, 373 Mass. 569, 574-577 (1977) (reference in prosecutor's closing to excluded evidence not grounds for reversal standing alone, but supported reversal in combination with other improper statements).

When, however, a prosecutor refers to excluded evidence "with respect to collateral or subsidiary issues in the face of strong evidence against the defendant, . . . such statements alone do not present sufficient reason to upset the verdict." Nordstrom, 364 Mass. at 316. That is the case here. The fact that police went first to the defendant's house before going to Nina's apartment was a tangential and unelaborated detail in the sequence of events concerning the police investigation, and the prosecutor made no further use of it.

b.  Disparagement of the defense.  After recounting the Commonwealth's evidence, the prosecutor turned to attacking the theory of defense and argued,

> "You heard the defense that was put on here.  They must have thought that you jurors just came off the last boat. I almost felt as though we were down at the Commonwealth Pier taking you people off the boat and saying, 'Come up here.  We want you to sit on a jury.'"

The prosecutor's remarks were a colloquial and potentially offensive way of suggesting that the defense was designed to take advantage of the jury's lack of sophistication.

While a prosecutor may not properly "characterize the entire defense as [a sham]," he may "address a particular point in defense counsel's closing argument as [such]."  Commonwealth v. Lewis, 465 Mass. 119, 130 (2013), citing Commonwealth v. McCravy, 430 Mass. 758, 764 (2000).[16]  Here, although the prosecutor should have avoided the particular phraseology he used, the statement was permissibly aimed at addressing the inherent implausibility of the defendant's and Hall's testimony that they merely happened by chance to be together in an

---

[16] Decisions issued closer to the time of defendant's trial spoke clearly against prosecutorial statements whose "emotional impact" likely prejudiced the jury's "fair, calm consideration of the evidence."  Shelley, 374 Mass. at 470 (condemning prosecutor's description of defense experts as "mercenary soldiers" and "prostitutes").  See Commonwealth v. Burnett, 371 Mass. 13, 18-19 (1976) (inappropriate for prosecutor to employ "abusive epithets").  We take the rule articulated in Lewis to be a clarification of this longstanding principle.

apartment with the stolen money and the murder weapons shortly after the robbery occurred.  The prosecutor could permissibly comment on the theory of the defense.  Commonwealth v. Borodine, 371 Mass. 1, 11 (1976), cert. denied, 429 U.S. 1049 (1977).  Accordingly, "[a]s much as we dislike the language of the prosecutor in argument," it did not constitute reversible error.  Commonwealth v. Burnett, 371 Mass. 13, 19 (1976).

c.  Improper vouching and telling the jury to do their "job".  The prosecutor's closing ended as follows:

"As I reflect on the job that the Boston Police Department did, I cannot help but feel . . . proud.  They did their job.  They gathered this evidence together and it was presented to you.  They did their job well.  Now you have the case and I am satisfied that you jurors are going to do your job well."

A prosecutor may not express personal belief in the credibility of witnesses or otherwise vouch for their testimony.  See Commonwealth v. Kee, 449 Mass. 550, 560 (2007).  Cf. Commonwealth v. Stone, 366 Mass. 506, 516 & n.4 (1974) (arguments as to witnesses' credibility, as opposed to statements of personal belief in same, are permissible).  The prosecutor's statement that he was "proud" that the police did their job "well" was an inappropriate statement of personal belief in the quality of their work.  In addition, exhortations to a jury to do their "job" are inappropriate even where such statements do not explicitly state that their "job" is to

produce a guilty verdict.  See Commonwealth v. Degro, 432 Mass. 319, 328-329 (2000).  See also Commonwealth v. Harris, 11 Mass. App. Ct. 165, 176 & n.9 (1981) (prosecutor who exhorted jury, "don't let her down," in reference to victim, improperly sought to arouse sympathy and prejudice).

Although the prosecutor's argument was improper in these respects, it does not merit reversal of the defendant's convictions.  The strength of the evidence against the defendant and the fact that the jury were instructed that closing arguments are not evidence lead us to conclude that the improper remarks were not so influential as to create a substantial likelihood of a miscarriage of justice.  See Degro, 432 Mass. at 329 (statement that jury should do their "job" did not deprive defendant of fair trial where evidence was strong and jury were correctly instructed); Commonwealth v. Nicholson, 20 Mass. App. Ct. 9, 18 (1985) (prosecutor's statement that jury should be "proud" of police did not require reversal in context of entire argument and judge's charge).

Finally, we have considered the cumulative impact of the multiple errors in the prosecutor's closing and have concluded that the evidence of guilt was of such strength that the verdicts were unlikely to have been influenced by the prosecutor's impermissible arguments, even when assessed collectively.  See Commonwealth v. Lussier, 364 Mass. 414, 424-

425 (1973) (where defendant did not object to closing, multiple prosecutorial misstatements did not justify reversal); Nordstrom, 364 Mass. at 316 ("highly improper" statements by prosecutor not cause for reversal where viewed "against the evidence and trial as a whole"); Commonwealth v. De Christoforo, 360 Mass. 531, 536—539 (1971), habeas corpus granted sub nom. De Christoforo v. Donnelly, 473 F.2d 1236 (1st Cir. 1973), rev'd, 416 U.S. 637 (1974) (improper arguments were "harmless as viewed in the context of the great weight of evidence of guilt").

6. Newly discovered evidence of "deal" with Clayton. Due process requires that the Commonwealth disclose material, exculpatory evidence, including evidence that "challenges the credibility of a key prosecution witness" (citation omitted). Commonwealth v. Sullivan, 478 Mass. 369, 380-381 (2017). This principle obligates the prosecution "to reveal to a defendant any understanding or agreement between the government and a key government witness." Commonwealth v. Gilday, 382 Mass. 166, 175-176 (1980). The defendant contends that his due process rights were violated because the Commonwealth entered into an agreement with Clayton whereby it would dismiss the charges against him in exchange for his testimony and the prosecutor failed to disclose the existence of this arrangement even when specifically asked by defense counsel prior to Clayton's testimony whether such an agreement existed.

In support of this argument, the defendant submitted two affidavits, one from his own trial counsel and one from Clayton's, both of which were made over thirty years ago, in 1991.[17]  The defendant offers no explanation for the delay in bringing the affidavits forward.  The Commonwealth denies any arrangement with Clayton and suggests that the defendant strategically delayed bringing the two affidavits to light until everyone who could shed firsthand light on the matter was no longer available.  It bears noting that the Commonwealth filed a nolle prosequi with respect to the charges against Clayton the day after the jury returned their verdicts against the defendant and Hall, and it is fair to assume that this fact was known to the defendant not long thereafter.

The motion judge assumed, but did not decide, the truth of the two attorney affidavits and nonetheless concluded that the defendant was unable to show prejudice.  We agree with the judge's reasoning and conclusion.  "To obtain a new trial on the basis of nondisclosed exculpatory evidence, a defendant must establish (1) that 'the evidence [was] in the possession,

---

[17] The defendant raised this argument concerning newly discovered evidence in his 2023 motion for a new trial and his 2024 motion to stay further execution of sentence.  The Commonwealth asserts that the argument was also included in his 1980 motion for a new trial, but the appellate record does not permit confirmation of this assertion.  In any event, any such argument made in 1980 would not have been accompanied by the affidavits that were created more than a decade later.

custody, or control of the prosecutor or a person subject to the prosecutor's control'; (2) 'that the evidence is exculpatory'; and (3) 'prejudice.'" Sullivan, 478 Mass. at 380, quoting Commonwealth v. Murray, 461 Mass. 10, 19, 21 (2011).

Clayton's testimony concerned Hall almost exclusively. See note 3, supra. To the extent Clayton mentioned the defendant, it was only to testify that the defendant was present in Nina's apartment after the crimes.[18] Clayton's testimony on this point was duplicative of the testimony of many other witnesses, including police officers, Nina, and the defendant himself; it was not a disputed point at trial. In these circumstances, it is "not reasonable to think that disclosure [of a government deal] would have changed the verdict[s] of the jury." Gilday, 382 Mass. at 178-179 (defendant was not prejudiced by suppression of evidence of potential deal with witness when witness's evidence was "less detailed and damaging to [the defendant] than the testimony of others").

7. Plenary review under G. L. c. 278, § 33E. Treating this appeal as subject to G. L. c. 278, § 33E, and pursuant to our obligation under that statute, we have considered the defendant's whole case to determine whether justice requires a

---

[18] We note further that Clayton's testimony was partially exculpatory of the defendant in that he said that he had never before met the defendant.

new trial or a reduction of the verdicts.  As part of our review, we have taken into account that the defendant's trial would be conducted differently if it took place today.  But assessing the whole case from the vantage point of the law to which the defendant is entitled, we conclude that § 33E relief is not warranted.

Conclusion.  We affirm the order denying the defendant's motion for a new trial.

So ordered.